been made, an intention to authorize an assessment for work done without any authority of law, not under any law, but by a town board acting under a pretended compliance with the act of 1893, but wholly unauthorized by that act,—without any jurisdiction to inaugurate and carry on the work. The expenses thus unauthorized cannot be said to have been done in such a mode as to come within the limited language of the act of 1895. Inasmuch as the work was not sanctioned by the legislative act, there can be no intention imputed to the legislature to dispense with consents. The case differs from Hatzung v. City of Syracuse, 92 Hun, 203, 36 N. Y. Supp. 521. July 19, 1895, a special meeting of the board created by the act of 1895 passed a resolution which authorized the assessment of the expense of the work of 1893. By the terms of the resolution, it is apparent that the board supposed the work, and expense referred to, had been done in virtue of the provisions of the act of 1893; but as the proceedings of the board of 1893 were without jurisdiction, and void, for want of the requisite consents, the assumption was unauthorized. The failure to obtain the consents authorized by the act of 1893 cannot be regarded as a mere irregularity. The board was without power and jurisdiction. The rule as to defects which do not affect the jurisdiction is discussed in Ensign v. Barse, 107 N. Y. 329, 14 N. E. 400, and 15 N. E. 401, and restated and explained in People v. Turner, 145 N. Y. 454, 40 N. E. 400.

It is claimed by the appellants that this action is prematurely brought. We find no such defense stated in the answer.

The learned referee has prepared a careful opinion, and, so far as it relates to the questions above discussed, it merits approval.

Judgment affirmed, with costs.

FOLLETT and ADAMS, JJ., concur. WARD, J., dissents.

---

(35 App. Div. 609.)

CONNOLLY v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, First Department. December 30, 1898.)

1. RAILROADS—COLLISION AT CROSSING—EVIDENCE.

On an issue whether an engineer was negligent in starting a train at a street-railroad crossing as a horse car was slowing approaching at a distance of 25 feet, a contract between the railroad and the street-car company, by which the crossing exists, which requires the street cars to come to a full stop not less than 10 feet from the track, and the street-car conductor to go on the track to look for approaching trains, is admissible, since it gives the engineer the right to assume that the car would come to a full stop before reaching the track.

2. SAME.

The evidence is admissible, though the car in question belonged to, and was operated by servants of, a company not a party to the contract, since, in the absence of information to the contrary, the engineer had the right to assume that it belonged to the company owning and operating on the track.

Barrett and Ingraham, JJ., dissenting.

Appeal from trial term, New York county.

Action by Mary A. Connolly, as administratrix of the estate of Joseph Connolly, deceased, against the New York Central & Hudson

River Railroad Company.   From a judgment for plaintiff, and from an order denying a new trial, defendant appeals.   Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Herbert E. Kinney, for appellant.

Otto H. Droege, for respondent.

RUMSEY, J.   The action was brought to recover damages for the negligent killing of the plaintiff's intestate, which was caused by the collision of a horse car driven by the intestate with a train of cars of the defendant, at the crossing of the street railroad and the defendant's road at Eleventh avenue and Thirty-Fourth street, in the city of New York.   The track of the defendant's road was laid down the center of Eleventh avenue.   The Thirty-Fourth Street Railroad Company extended along Thirty-Fourth street and across Eleventh avenue.   The plaintiff's intestate was driving a horse car on that road, and was approaching the defendant's track at Eleventh avenue.   A train of freight cars of the defendant stood on the track above Thirty-Fourth street and nearly at Thirty-Fifth street.   The rear of the train was near Thirty-Fourth street, and the engine was at Thirty-Fifth street.   As the street car, coming from Twelfth avenue towards Eleventh avenue, approached the crossing, a flagman signaled to the driver to come ahead.   At that time the car of the defendant's train which was nearest Thirty-Fourth street was 20 or 25 feet north of the crossing, and the horses of the street car were at or near the crossing on the west side of the avenue, and were in the neighborhood of 20 or 30 feet from the defendant's track.   They were going at a slow trot.   The train of the defendant commenced to move just about the time that the flagman gave the signal to come ahead, and while the horses attached to the car were 20 or 30 feet from the track.   The horse car did not belong to the Thirty-Fourth Street Railroad Company, but to the Metropolitan Street-Railway Company, and the driver was in the employ of the latter company.   What connection that company had with the Thirty-Fourth Street Railroad Company does not appear in the case.

Upon the trial the defendant offered in evidence a contract between the Thirty-Fourth Street Railroad Company and the defendant, providing for the crossing of the defendant's track at Thirty-Fourth street. It was stated by the counsel for the defendant, at the time of the making of the offer, that it was a contract under which this crossing existed at the time of the accident.   The contract was offered solely as bearing upon the question of negligence of the defendant's employés in starting the train at the time, and under the circumstances, that it was started.   The contract was objected to, the objection was sustained, and the defendant excepted.   This ruling of the court, we think, was erroneous.

The claim of the plaintiff was that the defendant's employés were guilty of negligence in starting the train at the time when the street car was slowly approaching the track of the defendant, and was at a distance of 25 or 30 feet from that track.   At that time the horses of the street car were under absolute control.   The car was going at a

slow pace, and might have been stopped in a very short distance. These facts were apparent to every one. That was the condition of affairs at the time the flagman made the signal, which is claimed by plaintiff to have been a signal to the driver of the car to come on. The train was then standing still, and there was no reason to believe that it was about to start. Under those circumstances, it was clearly not contributory negligence for the driver of the street car, the plaintiff's intestate, to continue approaching the track. But was it negligence for the engineer to start his train at that time, when the driver of the street car was slowly approaching his track, and at a distance of about 30 feet from it? The answer to that question depends upon the manner of doing business at that place, and whether the train had still the right of way at the crossing, or whether the persons upon it had any reason to believe that that right of way would be interfered with, or whether, as matters then stood, the duty was upon them to avoid the street car. If, at the time of starting this train, the engineer of the train, or the person who gave him the signal to start, knew, or ought to have known, that the driver of the street car was approaching the track with the intention of crossing it, the train should not have been started, and, if it was, the defendant was guilty of negligence. But if, when the train was started, the defendant's servants might have supposed that the driver of the street car had not determined to cross the track, or if, as the crossing was managed, they had reason to believe that the driver of the street car was likely to stop, and not attempt to cross the track, they were clearly not guilty of negligence as matter of law in starting the train. Therefore it was competent for the defendant to show what was the manner of doing business at that crossing, and whether, under ordinary circumstances, by the application of the rules which had been established, the street car was likely to stop before it attempted to take the crossing. The contract which is offered in evidence, and printed as an exhibit, is made between the New York Central & Hudson River Railroad Company, of the first part, and the Thirty-Fourth Street Railroad Company, of the second part, and was stated to be the agreement pursuant to which the crossing existed. From that statement it must be inferred that the contract was made pursuant to the statute (Laws 1890, c. 565, § 12), for the intersection of one of these railroads by the other, for that statute applies to street as well as to steam railroads. Port Richmond & P. P. E. R. Co. v. Staten Island Rapid-Transit R. Co., 71 Hun, 179, 24 N. Y. Supp. 566. It provides that each car of the street-railroad company, on approaching said crossing, shall come to a full stop at least 10 feet, and not more than 30 feet, from the nearest track of the party of the first part, and the conductor of the car shall go forward to the tracks of the party of the first part (the defendant), and look in both directions for approaching trains; and in no case shall the car be started forward until its conductor has looked in both directions, and ascertained that no approaching train on the tracks of the defendant is within a distance from said crossing making it unsafe for the car to proceed; and, if any approaching train of the defendant is within a distance of said crossing making it unsafe for such car to proceed, no car of the party of the second part (the street-railroad company) shall pass, or attempt to pass,

over the crossing until such approaching train has passed the crossing or come to a full stop before reaching it.    This contract between the defendant and the Thirty-Fourth Street road was the one by which the approach of the defendant's cars to the crossing was controlled.    Within the terms of that contract, it is quite clear that the employés of the defendant in charge of the train had a right to assume that at some point between 10 and 30 feet from the crossing the horse car would come to a stop, and had a right to manage the train in reliance upon that arrangement and understanding.

It is noticed that, although the train began to move when the street car was approaching the crossing, yet, the car being then 30 feet from the track, the duty of the driver to stop it still existed.    Those in charge of the train had the right to suppose that the driver of the street car would stop at least when he got within 10 feet of the crossing, and there was no duty upon them to hold the train unless they knew, or had reason to know, that the driver was not intending to stop.    But that they could not know until the driver had arrived within 10 feet of the crossing, and had not stopped.    Then, of course, it would have been too late to stop the train, so that until it had reached a point where the collision could not have been prevented there was no reason to suppose that the driver of the street car would persist in crossing and make it necessary for the engineer to try to prevent it.    It is very clear that, if these facts had appeared, it would have been, to say the least, a question for the jury whether any employé of the defendant was guilty of negligence in starting the train at a time when he had reason to believe, or might have believed, that the street car was not intending to attempt to cross.

But it is said that the Metropolitan Street-Railway Company was no party to this contract, and for this reason it is not admissible against one of its employés.    That fact, however, is not a matter of importance, as it seems to me.    The question is not whether the driver of the Metropolitan Company violated any rule laid down in this contract; but whether the defendant's engineer, using the crossing in accordance with this contract, had a right to rely upon it, in the absence of any information or reason to believe that the street car which was approaching the crossing did not belong to the company with which the contract was made.    The crossing existed by virtue of this contract.    So much was made to appear in the offer, and it must necessarily be assumed from that that the rights of the defendant, at least, were controlled and fixed by this agreement.    One of those rights was to approach the crossing with a train, although a street car may have been approaching, in reliance upon the fact that the car thus approaching would stop within 10 feet of the crossing, and to regulate the approach of its trains upon the theory that such stoppage would be made. Although, therefore, the engineer of the defendant saw the street car approaching, he had a right to rely that that street car would stop within 10 feet of the crossing, and, until he ascertained that the car did not stop, he was not called upon to take any steps to check the motion of his train.    When the servants of defendant in charge of this train saw a horse car approaching, knowing, as we must assume they did, that, by the rules which regulated crossing, the horse car

would stop within 10 feet, they had a right to rely upon that stoppage, unless they knew that this horse car was not one which was controlled by those rules. It seems to us, therefore, upon a careful consideration of this case, that the evidence excluded was proper for the consideration of the jury upon the question of the negligence of the defendant's employés, and for that reason the ruling of the court was erroneous.

The judgment and order must therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event of the action.

VAN BRUNT, P. J., and McLAUGHLIN, J., concur.

BARRETT, J. (dissenting). We are asked to set aside a verdict here for $10,000 against this defendant, the justice of which none of us questions, upon what seems to me to be a very trivial and unsubstantial point. The case was fairly tried and carefully presented to the jury in a charge to which no exception was taken. The jury have found upon sufficient evidence that the deceased was killed by the defendant's negligence, and that he himself was free from contributory negligence. Such a verdict, thus reached, should not be lightly disturbed. The point, and the sole point, worthy of consideration, made by the defendant (appellant) in support of its appeal, is that the learned trial justice erred in excluding a contract which it had made, three years before the accident, with a corporation known as the "Thirty-Fourth Street Railroad Company." This contract on its face was wholly irrelevant to the issues in this action. The deceased was not an employé of this company. He was not driving one of its cars. He had no relation whatever thereto. And yet it is seriously urged that, in an action between his legal representatives and the defendant, the latter had a right to show that this outside company had made a special agreement with it relating to the particular crossing and to the conduct there of its employés. The defendant's counsel offered the contract solely upon the question of the defendant's negligence. "It bears," he said, "not perhaps upon the negligence of the deceased at this stage, but it certainly does bear upon the negligence of the defendant." How it could possibly bear upon the concrete question of the negligence of the defendant quoad an employé of the Metropolitan Street-Railway Company it is difficult to perceive. No connection between that company and the contracting company was shown or suggested. It is true that the defendant's counsel observed that the instrument offered was "a contract under which this crossing existed at the time of this accident"; and he contends that the learned trial justice erred in not divining his meaning, namely, that the instrument was a contract under which the Metropolitan Street-Railway Company's right to cross existed at the time of the accident. But why should the learned judge have inferred anything of the kind from the language which the counsel thus used? And why should we be asked to reverse the ruling upon so vague a statement and so doubtful an inference? The learned judge, it seems to me, was clearly justified in thinking that what the learned counsel meant was not, of course, that the crossing literally existed as a locality under the contract,—

which would have been absurd,—but that the right of the Thirty-Fourth Street Railroad Company to cross existed thereunder. In other words, that the instrument was the contract which governed the rights of the parties thereto, not, surely, the rights of those who were not parties thereto. If he meant any more, was he not bound to say so? If he intended it, in some undisclosed way, to embrace the Metropolitan Street-Railway Company, should he have left that idea to inference? We are sometimes asked to affirm a judgment where an exception is lacking in precision or clearness, but this is the first time that we have ever been asked to reverse a judgment because the trial judge did not see through the obscurity of an appellant's offer, or divine his real, but inadequately expressed, meaning.

But, even if counsel had clearly stated that he intended in some way to connect this apparently irrelevant contract with the Metropolitan Street-Railway Company,—even, indeed, if the contract had been directly made with that company,—it would still have been plainly inadmissible. It was not claimed that its contents were known to the employés of either company. No presumption could certainly be indulged upon that head. If either company desired to act upon the agreement, the natural way was to make appropriate rules for the government of its employés. Companies do not usually furnish their employés with copies of their contracts with each other, or with extracts therefrom. In carrying out such contracts, they ordinarily instruct their employés as to the manner in which their duties are to be performed. No rule was here made; no instruction given,—at least, none was proved, offered, or suggested. How, then, can it be said that proof of the bare existence of such a contract between two companies was admissible because its covenants might here have influenced the conduct of the defendant's employés?

But, further, the defendant's own evidence conclusively shows that its employés could not possibly have been influenced upon the occasion in question by knowledge of the contents of this contract. The defendant's engineer, who actually backed the train upon the deceased's car, testified that he "did not see anything of the street car before the collision." He added that, when he was "swung up" to stop his train, he did not even know why he was so "swung up." The fact is that he was facing away from the horse car, and that he started his train upon a series of signals. First, the switchman gave the signal to the conductor; the latter then gave it to the brakeman on the car next to the engine; that brakeman then gave it to the engineer; and then the car was started back. This is the defendant's own testimony. Its conductor also testified that the train was thus started back on such signals. "We moved along towards Thirty-Fourth street at a very slow pace,—between three and four miles an hour, not over that,—and we had signals given us by the flagman at Thirty-Fourth street that everything was all right and to come ahead." Plainly, then, the contract had no influence upon any of the actors upon the scene. Not one of the defendant's employés intimated that he knew or acted upon it, or was influenced by any of the beliefs or suppositions which it might have suggested. The concrete question was whether the defendant was negligent in proceeding at almost the very moment when it

invited the deceased to cross, and to cross freely, in perfect assurance of safety, and without cautious inquiry. The evidence was conflicting as to whether or not it did this. It was upon that, and that alone, that the defendant's negligence was predicated; and, in the end, it all came down to a question of fact as to whether the last flagman— the man at the Thirty-Fourth street crossing—was so guilty. It was he whose original signal set all the succeeding signals in motion. Was he justified in signaling to his co-employés that everything was all right and to come ahead? There was abundant testimony for the consideration of the jury that this flagman flagged the deceased that all was right and to come on. There was also abundant testimony conflicting therewith. The plaintiff's witnesses declared that the flagman pointedly beckoned the deceased to cross,—thus, in effect, telling him that he need not pause, need not look to the right or the left, that all was safe,—while the defendant's witnesses declared the direct contrary, namely, that the flagman flagged, not the deceased, but his own people, to come on. The issue was thus distinct and crucial. As the jury believed or disbelieved the witnesses, the verdict must go. To say that upon the precise point thus in issue, upon the only question thus debated,—in fact, upon the only question submitted by the court to the jury,—the terms of this contract might have affected the conduct of the engineer, who was a mere machine responding to a series of signals, or of the switchman and brakeman, whose response to the signals was equally automatic, seems like a travesty upon the situation. The contract, in its relation to the immediate and actual incident, is in the air, and the reasoning based thereon seems very much in the clouds. The terra firma issue was whether the original flagman at the crossing was negligent. The learned judge put that single question to the jury. In his charge he says that the plaintiff's witnesses testified that they saw the flagman beckon Connolly, the deceased, to come on, while the flagman, on the contrary, testified that he signaled Connolly to stop. The learned judge then referred to the probabilities and improbabilities of these respective statements, and left it to the jury to say whether in fact the flagman did or did not beckon Connolly to come on. Certainly the contract was not admissible merely to strengthen the credibility of the defendant's witnesses, and it could, under these circumstances, have had no other office. The contract, therefore, had no conceivable bearing upon the issues submitted to the jury upon the conflicting testimony. It was inadmissible, in any aspect of its presentation as evidence, and, if admitted, could not possibly—certainly not justly—have affected the result.

The judgment should be affirmed, with costs.

INGRAHAM, J., concurs.